Judge Mary Jo Heston
Chapter 13
Location: Tacoma
Hearing Date: February 3, 2020
Hearing Time: 1:00 p.m.
Response Due: January 27, 2020

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

IN RE:

SARAH HOOVER,

    Debtor.

BK Case No. 19-42890-MJH

Chapter: 13

DECLARATION OF SARAH HOOVER IN SUPPORT OF RESPONSE TO MOTION TO ANNUL THE AUTOMATIC STAY

I, Sarah Hoover, hereby declare as follows:

1.     I am a Plaintiff in the above-referenced adversary proceeding and I have personal knowledge concerning all information in this declaration.

2.     I live at 18205 106th St E, Bonney Lake, WA 98391 ("the property" or "the home"), along with my husband and my two children. I have also been helping my adult niece, who has had financial difficulties ever since her father (my eldest brother) was murdered, who stays in our home with her three children, ages 11, 9, and 2 years old. Our home was purchased by my father, Ali Suleiman, in 2005, with the intention that the home would eventually become my own. My father passed away in 2015, and along with my brother Amir Suleiman, we were co-personal representatives of the estate. *See* King County Superior Court case no. 15-4-01840-7 KNT (non-probate estate matter).

3.     Although I am not a lawyer, my understanding is that my father's will contains a pour-over provision which placed the property into the Ali Suleiman Trust, of which I was a co-

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 1

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 1 of 10

trustee, and which provided that I would inherit the home. *See* the Last Will attached hereto as Exhibit A at ¶ 1.1 and 1.2.

4. It is my understanding that my father created the Ali Suleiman Trust to manage his assets in the U.S. since he spent months overseas, living part time in his home country and to distribute assets from his estate as he wished upon his death. My siblings and I were never part of the decision to create this trust.

5. After my father's passing in 2015, I was advised that transferring title of the property into my name would be time-consuming and likely expensive (costing several thousand dollars).

6. At the time of my father's passing, he also had two other properties that my brother and I successfully sold without making any transfers to the trust. Therefore, this was proof to me that I did not need to immediately transfer title.

7. Later this proved problematic because once I fell behind on the loan, it became difficult to work with the lender/loan servicer because I could not formally assume the loan while it was in arrears.

8. At some point in late 2018, our business had taken a downtown, and we had begun to fall behind on mortgage payments, to the point that one of our monthly payments was returned to us, which caused me concern.

9. My husband and I had suffered a downturn in our family business, which became evident by late 2018.

10. In January 2019, I began discussions with my mortgage servicer, Ocwen (who I understand to be the same company as PHH as of June 1, 2019) to fix the problem. The language used by Ocwen was an "assumption," but ultimately, I just wanted to fix the arrearage and become current on the loan. In that email, I included a copy of my father's death certificate and information concerning the trust, indicating that I was the heir to the property. A true and correct copy of a January 11, 2019 email I sent to Ocwen is attached hereto as Exhibit B.

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 2

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 2 of 10

11. Thereafter, I called and emailed Ocwen several times about the defaulted payment on my home.

12. At first Ocwen told me I could assume the loan and they sent me paperwork to do so, but the process was never fully explained to me and it wasn't until after submitting the paperwork that I was told that Ocwen could not do an assumption while the mortgage loan was in arrears.

13. Ultimately, in May 2019, I received the Notice of Trustee's sale (dated May 9, 2019) indicating that foreclosure would take place on September 13, 2019. The notice was addressed to me personally, Sarah Hoover, and not to the estate of my father or any other entity.

14. At this point, I did not know what I needed to do to save my home from foreclosure. I simply wanted a loan modification, or at least a chance to become current on the loan.

15. When I received a notice from Quality Loan Service ("QLS") on my door in May 2019, I immediately called Ocwen. to find out who QLS was and the representative told me they did not know QLS but assumed they were a third-party company trying to capitalize on my situation and to ignore the notice. Because of the large number of mailings I received from so many companies offering their services to help refinance, do loan modifications, and/or file bankruptcy, it made sense when Ocwen told me that QLS was not affiliated with them.

16. On that same phone call, Ocwen also instructed me to send a variety of forms to Ocwen titled "Assumption of Liability Agreement," to finally put the property into my name in Ocwen's servicing records, which I promptly did. A true and correct copy of my May 17, 2019 email to Ocwen is attached hereto as Exhibit C.

17. On June 1, 2019, servicing for my mortgage loan began being handled in the name of PHH Mortgage and I was then told that I would need to do a loan modification before I could assume the loan. However, before doing so, PHH needed me to complete a "family transfer."

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 3

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 3 of 10

18. For weeks I struggled to get PHH to receive and process the paperwork they needed for a "family transfer." After sending PHH an email in late June to early July that included the requested documents. I called to follow up to confirm their receipt and was told it would take 24 – 48 hours for the documents to upload for them tot review the paperwork in their system, and I was instructed to call back in a couple of days.

19. When I called PHH back a couple days later, I was told that they could not open all the documents and that I should fax them instead, which I promptly did.

20. On July 8, 2019, I sent a fax to PHH containing relevant information about my father's trust, as well as an updated copy of my driver's license, as PHH had requested. A true and correct copy of that fax and its confirmation page are attached hereto as Exhibit D.

21. A week later, I called to follow up on the receipt of my faxed paperwork and I was told that the fax was still being reviewed and it would take an additional 24-48 hours.

22. Finally, two weeks later, I was able to confirm that PHH had uploaded the faxed documents and I spoke to a representative who advised me to go to loansolutionscenter.com to upload additional documents for a loan modification.

23. I returned to the website a week later after gathering the additional documents requested and when I logged in to my account, I found a letter from NewRez stating that because it was to the foreclosure sale date, my loan servicer was unable to review the application for a loan modification. The NewRez letter was signed by my case manager Shelly Robertson which confused me since I thought she worked for PHH, not NewRez. A true and correct copy of an August 2, 2019 letter from NewRez is attached hereto as Exhibit E.

24. Throughout this time, I kept receiving different information and explanations from various representatives of PHH and/or NewRez. The process seemed impossible to navigate, and all I wanted was a chance to save my home. Every time I called PHH, it seemed like the representative wanted to help, and I trusted each person that I spoke with, but I was never being given complete information and often I was given contradictory information. I now

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 4

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 4 of 10

believe, with the benefit of hindsight, that there was some confusion about whether I could apply for a loan modification when the loan was not presently in my name.

25. I also note that, on numerous occasions, when I inquired about the status of the foreclosure and mentioned Quality Loan Service Corporation ("QLS"), **the PHH representatives told me to ignore anything from QLS because they "did not know who they were,"** and assumed they were some sort of opportunist company "trying to capitalize on my situation." I only later came to understand that QLS was the trustee which conducts foreclosure sales.

26. In August 2019 when I called PHH, they told me for the first time that there was a 37-day period before the sale date when a lender is not required to process any loan modifications and that I would need speak to QLS who PHH confusingly referred to as their "attorney" to stop or pause the foreclosure sale. At that point, I was given the phone number for QLS, I called them, and spoke to Robert McDonald, who I now understand is QLS' general counsel. He gave me some information concerning the foreclosure sale pending on my Home and advised that only PHH could stop the sale.

27. He also suggested that I should just turn in the modification paperwork to PHH even though it was inside the 37 day window prior to the sale, seek legal counsel, and continue to contact PHH daily requesting them to review the loan modification. Beyond that, Mr. McDonald told me that the only thing he could do was send me a reinstatement quote and he instructed me how to send that request to him in writing via email.

28. When Robert McDonald gave me his email address @qualityloanservice.com it was only then that I realized that he worked for the company that posted a notice on my door months ago and I then understood what that notice from QLS was all about.

29. After hanging up, I immediately followed Robert McDonald's suggestions and requested the loan reinstatement quote. Then called a phone number on one of the many flyers sent to me regarding the upcoming foreclosure and called some attorneys but I was not able to follow through with an appointment prior to the sale.

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 5

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 5 of 10

30. I confess that, as a non-lawyer, I did not fully understand the roles each of these entities played in the foreclosure process. Within just a few months, Ocwen had "become" PHH, and then "NewRez" started sending me letters "on behalf of" PHH. Then Quality Loan Service Corporation was involved, which sounds a lot like "loan servicing," which is what I now understand PHH's role to be. I am still confused as to how a "loan service corporation" is the trustee that conducts the actual foreclosure sale. All I knew was that I was trying to save my home, and that PHH was the company that controlled whether my home would be foreclosed.

31. On August 20, 2019, I began keeping records of some of my phone calls with PHH, including times I spoke with PHH on August 20th, 21st, 23rd, 28th (twice), 29th and 30th (I also noted two other calls, both on September 12th). The purpose of these calls was to try to work with PHH to find out how to save my home from foreclosure. In all of my phone calls I looked to PHH, or Ocwen before PHH, for instruction on what I needed to do to make that happen. I was never given the same instructions or the same information. *See* contemporaneous notes attached hereto as Exhibit F.

32. I then proceeded to upload the documents I had been gathering to the loansolutioncenter.com website and followed up with Shelly Robertson, my account manager and single point of contact at PHH to confirm receipt.

33. PHH confirmed they received the documents from the loansolutioncenter.com website but they had not been uploaded into their system yet and I was told to call back the next day.

34. On or about August 29, 2019, I emailed Mr. McDonald at QLS to follow up on my August 14, 2019 emailed original request for a reinstatement quote since I had not heard anything back from him. He responded that a review of the Trustee's file indicated that he did not have the information. Eventually on September 4, 2019, QLS emailed a reinstatement quote to me. A true and correct copy of this email exchange is attached hereto as Exhibit G. I note that the reinstatement quote listed my father's name and my own name as "borrowers.

DECLARATION OF SARAH HOOVER IN SUPPORT OF RESPONSE TO MOTION TO ANNUL THE AUTOMATIC STAY - 6

Henry & DeGraaff, P.S.
787 Maynard Ave S.
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 6 of 10

35. As the foreclosure sale approached, it became clear to me that the only option I had to was to file a bankruptcy to halt the sale and work toward a payment plan where I could eventually become current on the loan. My understanding at the time was that a Chapter 13 bankruptcy would be the best approach.

36. With only $27,695.82 owing in arrears, there was no doubt that I could cure the arrears in a chapter 13 plan as my household had regular income that could support chapter 13 plan payments. Attached hereto as Exhibit H is a copy of the financials I sent to PHH at around the time of my bankruptcy filing.

37. In early September, after three weeks of delay, QLS finally me a letter attached to an email which provided reinstatement figures for the loan and informed me that I would need to pay $27,695.82 by September 12, 2019 to reinstate the mortgage and avoid foreclosure.

38. With very little time left before the foreclosure sale, I filed for bankruptcy on September 9, 2019. A true and correct copy of relevant excerpts of my filings are attached hereto as Exhibit I.

39. On the bankruptcy petition, I listed PHH as the creditor because I thought that was correct, as PHH is the company where I pay my monthly payments. I did not think anyone else was a "creditor" – for example, I did not owe any money to QLS, so I thought it would be improper to list them as a "creditor" to the court when they were not a creditor.

40. I had also hired a company to help me obtain a loan modification, which was called Elite Legal Network. They turned out to be ineffective at this task, but they were willing to convey my bankruptcy filing to PHH as well. On September 9, 2019, on my behalf, Elite Legal Network sent a fax to PHH containing my bankruptcy filing information. A true and correct copy of this fax is attached hereto as Exhibit J.

41. On September 12, 2019, the day before the scheduled sale, I called PHH at least twice. The first representative I spoke with confirmed that my bankruptcy filing had been "added," but that whatever department was to issue a "stop" on the foreclosure had not yet done

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 7

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 7 of 10

so. A true and correct copy of my contemporaneously-taken notes reflecting these conversations are attached hereto as Exhibit K.

42. I would note that on one of these phone calls to PHH on September 12, 2019, my case manager" Shelly Robertson – the person identified on the August 2, 2019 letter as my "case manager" – refused to speak with me (despite having spoken to me before), adding insult to injury on the day before I was scheduled to lose my home.

43. The following day, I learned that PHH had not stopped the foreclosure sale. My brother and my nephew started receiving phone calls that my home was sold at a foreclosure sale auction and that there were significant surplus funds. They gave them my phone number and one of them called me that afternoon after the sale and told me that in order to get my surplus funds I had to sign some paperwork with a notary and that they would keep 10% of the profit for the fee. He also explained that the new owner was a company and typically when it's a company they buy multiple homes at auction and hire companies like his to pay out the surplus funds when there are some. I am unclear as to whether he was hired by IH6 Property Washington, LP ("IH6"), the company that purchased my home, but I was led to believe that to be the case.

44. I contacted PHH the following week and spoke to an account representative named Melvin. We spoke on the phone for a very long time while he reviewed all the documents in my account file, and he said he would call back after doing some additional research.

45. On September 19, 2019, I received a call back from Melvin, the PHH representative I have talked to previously. He claimed that my bankruptcy filing did not affect the loan because I was, according to him, I was not a successor in interest to the property. He claimed that he was unable to find documents which I had provided numerous times to PHH, but then explained that there were "over 600 documents and emails" in my file and, essentially, that he did not have time to review them all. Melvin suggested that I send a note to PHH with a copy of the page in the Suleiman Trust that references the property, photo identification my father's

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 8

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 8 of 10

death certificate, the Affidavit of Trust, and the and a copy of the Bankruptcy Notice to PHH's research department so that they could try to have the sale rescinded.

46. Therefore, at my request, on September 19, 2019, Elite Legal Network sent another fax to PHH with more information. *See* Exhibit J. An email sent to Elite Legal Network the same day also documented my conversations with Melvin. *See* Exhibit L.

47. On September 20, 2019, I had Elite Legal Network send another fax to PHH with supplemental information, again including my bankruptcy filing. *See* Exhibit M.

48. On September 20, 2019, NewRez sent a letter confirming that it could speak with Elite Legal Network with respect to the loan. A true and correct copy of this letter is attached hereto as Exhibit N.

49. On or about September 24, 2019, at my request, Elite Legal Network contacted QLS and IH6 on my behalf to request rescission of the foreclosure sale.

50. On or about September 26, 2019, I came home to find a notice taped to my door identifying IH6 Property Washington, LP as the new owner of my home and instructing me to vacate my home by December 1, 2019. Attached is a true and correct copy of this notice as Exhibit O.

51. At that point I felt defeated. I had tried to prevent the foreclosure so that I would have a chance to save my home, however nothing I did had any effect, not even bankruptcy could stop it. Thus, continuing with the bankruptcy at that point made little sense and I let the case dismiss.

52. Soon thereafter I spoke to the owner of IH6 directly and he indicated that he would have no problem selling my house back to me so long as he made a profit if QLS was willing to pay an additional $100,000 above what he paid at the foreclosure sale.

53. Facing no progress from Elite Legal Network to rescind the sale, on October 1, 2019, I decided to call QLS myself. I spoke to Robert McDonald at QLS, who at first seemed frustrated that he was going to have to "unwind" this sale since it would potential cost a lot of money and effort to do so. I explained that it was my understanding that the third-party buyer

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 9

**Henry & DeGraaff, P.S.**
787 Maynard Ave S.
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 9 of 10

might be willing to sell the property back and he asked me to have the buyer from IH6 to call him to discuss the matter which I did.

54. A week later, I called to follow up with Mr. McDonald about the rescission, but I was unable to reach him and left a voicemail on October 10, 2019.

55. On October 19, 2019 I received a letter from NewRez dated October 3, 2019, directed to my husband, Leo Hoover, indicating that NewRez finally acknowledged my ownership interest in the house and that they needed to confirm a successor-in-interest for the mortgage loan. A true and correct copy is attached hereto as Exhibit -P.

56. The next day, I called QLS again and left another voicemail for Mr. McDonald, telling him about the correspondence I had just received from PHH and asking him to call back to follow up on our prior discussions for rescission of the sale and left another voice message.

57. I later learned that the foreclosure sale generated $167,407.96 in surplus funds, which QLS has been holding since the sale. I never received any notice about surplus funds from QLS, PHH or anyone else except for the unsolicited calls I received soon after the sale.

58. With no hope that I would be able to resolve this on my own, my husband and I contacted several nonprofits and attorneys in the area for assistance and hired attorneys who could assist us with this matter.

59. In early January 2020, I received correspondence dated December 24, 2019 from NewRez that I am now confirmed as the Successor in Interest for the mortgage loan, however, they have not acknowledged the void foreclosure sale. *See* Exhibit Q.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON AND THE UNITED STATES THAT THE ABOVE IS TRUE AND CORRECT.

DATED this January 27, 2020

Sarah Hoover

DECLARATION OF SARAH HOOVER IN SUPPORT OF
RESPONSE TO MOTION TO ANNUL THE
AUTOMATIC STAY - 10

HENRY & DeGRAAFF, P.S.
787 MAYNARD AVE S.
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Case 19-42890-MJH    Doc 25    Filed 01/27/20    Ent. 01/27/20 22:52:01    Pg. 10 of 10